**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RON F.,**

                **Plaintiff,**

    **v.**                              **Civil Action 2:23-cv-4165
                                           Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

                **Defendant.**

**OPINION AND ORDER**

Plaintiff, Ron F., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 8) and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff previously filed an application for DIB, which was denied initially and on reconsideration. (*See* R. at 17–18 (describing this application)). He did not request a hearing or otherwise appeal this determination. (*Id.*). The ALJ determined that, pursuant to 20 C.F.R. § 404.921, the reconsideration determination date of February 24, 2021, is binding through the date of its issuance. (*Id.*). The ALJ declined to reopen this application. (*Id.*).

Plaintiff filed his current applications for DIB and SSI with a protective filing date of August 19, 2021, alleging disability beginning March 26, 2020, due to low vision/blindness due to a brain infarction from a stroke, stroke, high blood pressure and cholesterol. (R. at 206–17, 268). After his applications were denied initially and on reconsideration, Administrative Law

Judge Matthew Winfrey (the "ALJ") held a telephone hearing on February 1, 2023.  (R. at 35–62).

The ALJ denied benefits in a written decision on February 20, 2023.  (R. at 14–34).  The Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final

decision.  (R. at 1–6).

Plaintiff filed the instant case seeking a review of that decision on December 19, 2023, and

the Commissioner filed the administrative record on February 6, 2024.  (Docs. 1, 7).  The matter

is ripe for review.  (Docs. 8, 10, 12).

### A.  Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and the testimony from the

administrative hearing as follows:

> *** [Plaintiff] testified that he needed assistance shopping for items and with
> directions. He alleged difficulty riding the bus and cooking meals. He endorsed
> sleep disturbance. He used rails in the shower to prevent falls. He could lift up to
> 20 to 30 pounds but had difficulty walking. He performed light chores. He could
> stand up to 10 minutes.
>
> He testified that he could see a computer screen or cell phone and read print. He
> testified that his vision was fuzzy and he could not see road signs to drive. He
> endorsed imbalance. He had motor deficits (see Exhibits 1E, 6E).

(R. at 24–25).

### B.  Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records:

> *** In March 2020 [Plaintiff] required hospitalization for cerebral vascular
> accident. He reported vision loss with no vision on the left side and blurry vision
> on the right, headaches, and dizziness. He denied focal weakness in the extremities,
> chest pain, or palpitations. [Plaintiff] was in hypertensive urgency upon admission.
> He maintained normal muscle strength with some mild left facial droop. His
> comprehension and naming remained intact. An MRI confirmed subacute lacunar
> area infarct as well as moderately severe ischemic white matter changes with old
> lacunar infarcts and old traumatic brain injury. Abdominal imaging incidentally
> showed lumbar postoperative changes of a prior lumbar fusion (Exhibit 1F, 7F,
> 12F). At a follow-up appointment, [Plaintiff] denied new numbness, tingling or

weakness. He could not drive. He was encouraged to walk two miles per day for exercise. [Plaintiff] also reported some cognitive deficits but exhibited good judgment and insight on exam. He also described stress related to finances and unemployment. He later endorsed moderate depressive symptoms. He was able to walk to the pharmacy and bank, but alleged becoming lost on his way home. He was able to see limited information on his computer. He was referred to community resources to manage short-term disability and health insurance (Exhibit 3F, 7F).

In May, [Plaintiff] was evaluated for vision loss post-stroke. His neuro-ophthalmic evaluation revealed early nuclear sclerotic cataracts with increased cup-to-disc ratios suspicious for glaucoma. Intraocular pressure was normal. Humphrey visual field testing showed dense left vomitus hemianopic field cut. His visual acuity with correction was 20/40 and 20/25 in the right and left eyes respectively. He was unable to drive due to visual field loss. Three months later, [Plaintiff] denied improved vision but had 20/25 visual acuity. The persistent left homonymous hemianopic field cut was stable (Exhibit 2F, 7F, 9F). [Plaintiff] told his primary care provider that he was doing okay without side effects from medications. His blood pressure had improved. He reported memory deficits, but had a normal exam. [Plaintiff] later reported walking two miles per day. By October, [Plaintiff] was working with vocational rehabilitation for job placement and reported things were going better for him at that time notwithstanding no improvement in terms of vision (Exhibit 3F, 7F, 9F). In February 2021, [Plaintiff] denied eye pain, blurred or double vision, headaches, or weakness. Although he denied improvement, [Plaintiff]'s vision was stable without new focal neurologic symptoms. Visual field testing remained stable. The provider recommended exercise and smoking cessation (Exhibit 2F, 7F). His vision remained stable through August (Exhibit 9F). Despite the residual visual impairment, during this period, [Plaintiff]'s physical and mental status exams were largely normal. Less than a year after the stroke, [Plaintiff] was studying to sell insurance and mental status exam was normal, which suggests greater cognitive abilities. He was ultimately unable to obtain a license due to his past record rather than his impairments. He reported slight improvement in vision. He was reportedly compliant with treatment for hypertension but had high blood pressure on exam. He was obese with a BMI of 31.13. His medications were increased (Exhibit 3F, 7F). He had no motor deficits after the stroke (Exhibit 4F). [Plaintiff]'s function report suggest he attended an online university in June 2020 to September 2021, but had to withdraw due to his living situation rather than his impairments (Exhibit 10E). At the end of 2021, he injured his right wrist in a car accident while walking to work. He did not sustain significant injuries and his symptoms improved. On exam, he was obese with mildly elevated blood pressure and mild tenderness at the wrist. [Plaintiff]'s doctor cleared [Plaintiff] to return to work without restrictions, which suggests greater physical abilities than alleged (Exhibit 7F).

When [Plaintiff] sought emergency room care for cough in April 2022, his exam revealed normal motor and sensory function without focal deficits. His mood, judgment, and affect were normal. He did not appear distressed (Exhibit 5F, 7F).

3

Follow-up primary care notes reflect mostly normal exams as well (Exhibit 10F). Around that time, consultative optometrist Dr. Yoest examined [Plaintiff]'s vision, including visual field testing. Dr. Yoest noted left homonymous hemianopia and constriction of right visual field bilaterally as plotted on visual field testing. Corrected vision at a distance was 20/20 and corrected vision for reading was 20/25. He had normal muscle function but some mild hypertensive changes. Dr. Yoest noted that [Plaintiff] reportedly lost things, had difficulty reading and relied on audio when possible, difficulty keeping online. She further opined that his mobility was poor for detection of hazards (Exhibit 6F). The undersigned finds this persuasive as it supports near and far acuity deficits as well as environmental restrictions due to abnormal visual fields. This is consistent with and supported by the evidence as a whole, including prior vision exams and testing, as well as Dr. Yoest's own exam findings. However, Dr. Yoest relies on [Plaintiff]'s self-reported symptoms and limitations, but did not offer specific functional limitations beyond avoidance of hazards. This makes the assessment somewhat less persuasive as it is not a function-by-function assessment of [Plaintiff]'s basic work-related abilities and limitations (SSR 98-6p). Nevertheless, the exam findings show that [Plaintiff] is not statutorily blind but has abnormal visual fields that warrant specific visual limitations as set forth above.

After the consultative exam, primary care treatment records show that [Plaintiff] was doing well on medications and weight loss with a BMI of 28.76. His blood pressure was controlled, and physical and mental status exams were normal. in July 2022 [Plaintiff] was hit by a car while out walking and sustained minor injuries. Imaging of the neck showed no acute changes, but some degenerative changes. Imaging of the low back also showed levoscoliosis, moderate disc space narrowing, and facet degenerative changes. No significant neurological deficits were observed. He was able to ambulate without difficulty. He was awake, alert, and answered questions appropriately (Exhibit 7F). He later complained of worse hip and low back pain. An exam showed tenderness and limited range of motion, but no distress. He was alert and oriented. [Plaintiff]'s pain later improved; he reportedly walked five miles per day and felt better overall. His exam was normal and blood pressure remained well controlled (Exhibit 8F). A neuro-ophthalmological exam at that time showed [Plaintiff]'s vision was stable related to left homonymous hemianopic field cut. [Plaintiff] was acclimating to the new normal. He was not able to drive due to his visual field deficit (Exhibit 9F). He was able to take the bus, however (Exhibit 10F).

From a mental standpoint, [Plaintiff] did not establish mental health care until October 2022. He appeared pleasant and cooperative notwithstanding depressive symptoms. His thoughts were coherent, and memory was unimpaired. He was diagnosed with depressive disorder. Psychotherapy notes repeated detailed mostly normal mental status exams with some noted agitation or apprehension. He described frustration rather than depression; he appeared irritable at times but with no cognitive deficits observed. He expressed frustration and anger due to his living situation. He appeared disheveled at times, but lived in a homeless shelter. He

4

exhibited poor insight. However, his provider stated that it was unclear what cognitive deficits allegedly stemmed from [Plaintiff]'s stroke or other brain injury. This is particularly true given repeatedly normal mental status exams in that regard. By December, [Plaintiff]'s mood had improved. He was less irritable. He showed good judgment and insight with clear and coherent thoughts (Exhibit 10F).

(R. at 25–27).

## C.     Relevant Medical Source Opinions

The ALJ summarized the medical source opinions as follows:

The [ALJ] finds the state-agency medical consultants' physical assessments persuasive to the extent that their findings support the ability to perform medium work with additional hazard limitations, namely no driving. Their assessments are generally consistent with and supported by the evidence and have thus been incorporated into the residual functional capacity. However, the undersigned finds that additional postural, environmental, and visual limitations are warranted given the exam findings and [Plaintiff]'s subjective symptoms related to visual acuity, including fuzzy or blurred vision, and no low light. The undersigned adopts their statutory blindness finding and visual efficiency, as evidence received after their assessments do not show otherwise. His vision has been stable since the onset date. The state-agency did not assess [Plaintiff]'s mental impairments, but evidence after their assessments establishes depressive disorder (Exhibits 3A, 4A, 5A, 7A).

The [ALJ] finds the residual functional capacity assessment by [Plaintiff]'s primary care provider Dr. Kitchin unpersuasive, as it is not consistent with or supported by the evidence as a whole. The opinion suggests significantly greater visual limitations than is supported by the evidence, including neuro-ophthalmological exams and the consultative exam. This provider was also not treating [Plaintiff] for this condition and their opinion is outside their area of expertise, which renders the assessment less persuasive. Moreover, [Plaintiff]'s activities support grater abilities than assessed. For example, [Plaintiff] rode the bus without difficulty and could walk two to five miles at a time (see Exhibit 6E, 3F, 7F, 8F). There are no specific findings from this provider that warrant the limitations assessed and their treatment records do not substantiate such significant limits, e.g., reduced stand and walk, reduced manipulative abilities. The [ALJ] has considered [Plaintiff]'s low vision in the residual functional capacity with the preclusion from hazards, driving, near and far acuity, and lighting in the workplace. These limitations adequately account for [Plaintiff]'s vision impairment. The opinion does support the ability to lift up to 50 pounds, which is consistent with this decision as well (Exhibit 11F). Dr. Kitchin previously suggested that [Plaintiff] was unable to work due to his vision (Exhibit 3F/20); however, as this is a statement on an issue reserved to the Commissioner, it is inherently neither valuable nor persuasive and need not be considered (20 CFR 404.1520b(c)(3)(i) and 416.920b(c)(3)(i)).

5

(R. at 28).

### D.    The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2019, and for purposes of statutory blindness through June 30, 2028, but the ALJ concluded that the severity of Plaintiff's visual disorder does not meet the statutory definition of blindness.  (R. at 20).  The ALJ then found that Plaintiff has not engaged in substantial gainful activity since March 26, 2020, his alleged onset date of disability.  (*Id.*).  The ALJ determined that Plaintiff has severe impairments of status-post cerebral infarction with residual left homonymous hemianopia (bilateral) and constriction of right visual field (bilateral); hypertension; lumbar and cervical degenerative disc disease; and depressive disorder.  (*Id.*).  Still, the ALJ concluded that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment.  (R. at 21).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record [the ALJ] finds that [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except no climbing ladders, ropes, or scaffolds; no peripheral vision on the left; occasional near and far acuity; no exposure to workplace hazards such as unprotected heights or dangerous, unprotected moving mechanical parts; no occupational driving; could not work in low lighting - that is, jobs require typical bright office lighting; individual is limited to perform simple, routine tasks with no more than occasional changes in duties and the work setting.

 (R. at 24).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (R. at 25).

Relying on the vocational expert ("VE")'s testimony, the ALJ concluded that Plaintiff is unable to perform his past relevant work.  (R. at 28).  But considering his age, education, work

experience, and RFC, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform, such as a hand packager, laundry aide, and floor waxer. (R. at 29). Consequently, the ALJ concluded that Plaintiff has not been disabled within the meaning of the Social Security Act since March 26, 2020. (R. at 30).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff raises several assignments of error. First, he alleges his RFC inadequately addresses his limitations. (Doc. 8 at 2–3). Second, Plaintiff challenges the ALJ's analysis of his credibility and symptom severity. (*Id.* at 3–5). Third, Plaintiff takes issue with the ALJ's consideration of his need for a walker. (*Id.* at 5–6). Finally, Plaintiff argues that his RFC is incompatible with the jobs the ALJ found him capable of doing. (Doc. 12 at 2). In response, the Commissioner says that the ALJ's decision is supported by substantial evidence and should be

affirmed. (Doc. 10 at 4–12). For the following reasons, the Undersigned agrees with the Commissioner.

### A.       Limitations in Plaintiff's RFC

Plaintiff argues that the RFC improperly accounts for his conditions for various reasons. (Doc. 8 at 2–3). A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [his] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must evaluate several factors, including medical evidence, medical opinions, and the plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). In doing so, the ALJ must resolve conflicts in the record. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). To that end, an ALJ "is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Beckham v. Comm'r of Soc. Sec.*, No. 1:19-cv-576, 2020 WL 5035451, at *7 (S.D. Ohio Aug. 26, 2020) (quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020)). Again, this Court must affirm the ALJ's decision if it is supported by substantial evidence. *See Christine G. v. Comm'r of Soc. Sec.*, No. 2:22-cv-1969, 2023 WL 5717417, at *6 (S.D. Ohio Sept. 5, 2023) (stating that the court must affirm if substantial evidence supports the ALJ's decision, even if the court would have resolved conflicts in the record differently).

The Court addresses each of the ALJ's alleged errors in turn.

### 1. Lumbar and Cervical Degenerative Disease

Plaintiff disputes the state agency doctors' findings, who concluded Plaintiff is capable of medium work. (Doc. 8 at 3, citing R. at 65–71). The ALJ agreed with that determination. (R. at 24). Plaintiff argues this is reversible error since the state agency doctors did not review medical records about his lumbar and cervical degenerative disease. (Doc. 8 at 3). But notably, Plaintiff does not point to any medical records concerning these impairments that would have changed the state agency doctors' findings. (*See* Doc. 8 at 2–3). Nor does he identify any limitations he believes should have been included for his cervical and lumbar issues. (*Id.*).

Even so, the ALJ did not adopt the state agency doctors' findings wholesale, and he considered Plaintiff's lumbar and cervical degenerative disease. As the ALJ highlighted, the record contains little to no treatment records on these conditions. (R. at 27 (discussing Plaintiff's back pain but that "[h]e has not received any significant treatment for back or neck pain"); *see, e.g.*, R. at 423 (stating Plaintiff denies back and joint pain), 465 (noting Plaintiff has "[c]hronic back pain with radiculopathy" but is not on "daily narcotics"), 504 (noting degenerative issues in the spine), 507–11 (discussing only hip pain, and not back pain, two months post-car accident)). Still, the ALJ listed these conditions as severe impairments. (R. at 20). Then, the ALJ found that while Plaintiff has "some back pain," the record shows only "some tenderness and reduced range of motion." (R. at 27; *see, e.g.*, R. at 350 (noting chronic back pain), 364 (denying muscle or joint aches), 368 (complaining of muscle and joint aches), 417 (marked "negative" for back pain), 423 (noting no back tenderness), 504 (discussing x-ray results for Plaintiff's lumbar and cervical issues), 507 (stating Plaintiff was walking five miles a day shortly after his car accident), 510 (noting Plaintiff's lower back pain and limited range of motion shortly after his car accident)).

In addition, the ALJ highlighted that Plaintiff consistently had "normal gait, strength, and sensation" upon examination.  (*Id.*; *see, e.g.*, R. at 354 ("5/5 strength in all extremities"), 423 ("Good range of motion in all major joints"), 442 (stating Plaintiff had "5/5" strength in his extremities), 543 (noting no significant gait issues)).  The ALJ further discussed evidence showing Plaintiff walked two to five miles a day, even after sustaining minor injuries from a car accident.  (*See* R. at 26–27, citing R. at 506–11 (discussing Plaintiff's car accident in July 2022 and subsequent hip pain); R. at 28, citing R. at 303 (noting in Plaintiff's function report that he can walk "2+ miles" before he needs to rest); 450 (stating that despite some pain after a car accident in December 2021, Plaintiff could ambulate normally), 474 (noting Plaintiff got up and went to work after being hit by a car and that his wrist pain was improving), 507 (discussing that Plaintiff walks five miles a day just two months after a car accident)).  Elsewhere in his opinion, the ALJ also said that "[Plaintiff's] activities support [greater] abilities than assessed."  (R. at 28).  For example, the ALJ noted that Plaintiff rides the bus without difficulty, performs light chores, and cooks his own meals.  (R. at 24, citing R. at 50–51 (discussing Plaintiff's cooking and chores); R. at 28, citing R. at 300 (reporting Plaintiff can cook and do his own housework), 301 (noting Plaintiff walks and takes public transportation alone), 527 (stating Plaintiff took the bus to his appointment), 528 ("Took bus without difficulty.")).

Consequently, the ALJ found that "the evidence supports the ability to perform medium work with additional postural limitations to accommodate any back or neck pain[.]"  (R. at 27).  For example, the ALJ determined Plaintiff should not climb ladders, ropes, or scaffolds, and he stated Plaintiff should have "no exposure to workplace hazards such as unprotected heights or dangerous, unprotecting moving mechanical parts."  (R. at 24).  So, although the state agency doctors did not consider these conditions, the ALJ did, and he included additional limitations in

Plaintiff's RFC as a result. *See Christine G*, 2023 WL 5717417, at *6 (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 31 (6th Cir. 2009)) (finding the ALJ properly evaluated the state agency doctors' opinions where the ALJ considered more recent evidence not previously available to the doctors); *Tate v. Comm'r of Soc. Sec.*, No. 1:09-cv-138, 2009 WL 6813371, at *7 (S.D. Ohio Dec. 4, 2009) (affirming an ALJ's decision, even though the state agency doctors did not review certain evidence, because "the ALJ did not blindly adopt [their] opinions but also imposed additional restrictions"); *Turner v. Comm'r of Soc. Sec. Admin.*, No. 3:17-cv-00142, 2018 WL 3544933, at *5 (S.D. Ohio July 24, 2018) ("Although these doctors did not have access to the entire record at the time they authored their opinions, the ALJ properly considered, discussed, and analyzed more recent evidence in the record. . . rather than adopting their opinions wholesale without further evidentiary review. This was not error."). Because the ALJ supported his RFC determination with substantial evidence, the Undersigned finds no error.

### 2. *Limitations on Lifting*

Turning to Plaintiff's lifting abilities, Plaintiff says the ALJ erred in finding he could lift 25 to 50 pounds occasionally. (Doc. 8 at 3). Plaintiff bases this argument on his hearing testimony stating he could lift only 30 pounds and has difficulty walking. (*Id.*).

To start, ALJ found Plaintiff's statements about his symptoms only partially credible. (R. at 24–25). As such, he did not need to include limitations based on Plaintiff's testimony alone. *See Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("It is for the [Commissioner] to resolve conflicts in the evidence and to decide questions of credibility." (internal citation omitted)); *Driggs v. Comm'r of Soc. Sec.*, No. 2:11-cv-0229, 2012 WL 204044, at *3 (S.D. Ohio Jan. 24, 2012) ("The ALJ could reasonably have concluded that there was no support in the various medical records for a finding of physical incapacity, and did not have to accept plaintiff's testimony at face value.").

Further, Plaintiff's hearing testimony is not as clear as he suggests in his briefing.  (*See* Doc. 8 at 2–3).  At the hearing, Plaintiff testified he had "no idea" how much he could lift, since he's not "lifting weights."  (R. at 50).  However, he approximated he could lift 30 pounds.  (*Id.*).  When asked if he had "any problems with walking," Plaintiff responded, "No."  (*Id.*).  But later in his testimony, Plaintiff said he occasionally uses a walker and that he used one after his most recent car accident.  (R. at 51).  These statements do not conclusively show that Plaintiff can lift only thirty pounds or has significant difficulties with walking.  (*Cf.* Doc. 8 at 3).

Notwithstanding these inconsistencies, substantial evidence supports the ALJ's determination that Plaintiff could do medium work and occasionally lift weights up to 50 pounds. First, Plaintiff points to no objective medical evidence recommending any further limitations on his lifting abilities.  (Doc. 8 at 3).  But the ALJ supported his lifting determination with substantial evidence from the record.  For example, he noted that after one of Plaintiff's car accidents, the doctor cleared Plaintiff "to return to work without restrictions."  (R. at 26, citing R. at 474). According to the ALJ, this clearance "suggest[ed] greater physical abilities than alleged."  (*Id.*). The ALJ also discussed that Plaintiff's primary care provider, Dr. Kitchin, said Plaintiff could lift up to 50 pounds.  (R. at 28, citing R. at 580 (stating Plaintiff could lift up to 50 pounds and that Plaintiff's impairments did not prevent him from "lifting, pulling, holding objects"), 581 (stating Plaintiff "can lift more. . . no issues with [range of motion]" but has visual impairments)).  Even more, Plaintiff's own function report describes no issues with lifting.  (R. at 303 (denying that his conditions affect his lifting abilities)).

Still, Plaintiff argues that "[n]o other medical source opined that Plaintiff could do this heavy of work."  (Doc. 8 at 3).  But notably, only the state agency doctors opined on the level of work Plaintiff could do, and Plaintiff does not challenge the ALJ's evaluation of the medical

opinions in the record. (*See* R. at 70 (recommending medium work), 77 (same), 84 (same), 92 (same), 578–82 (stating Plaintiff could not work due to vision impairments only, but finding no issues with lifting); 425–30 (including no appropriate work level for Plaintiff and noting only that Plaintiff's "mobility is poor for detection of hazards")). Regardless, "[i]t is the duty of the ALJ to resolve any conflict among the evidence and weigh the medical source opinions." *Christine G.*, 2023 WL 5717417, at *6. Because the ALJ evaluated the medical opinions in the record in accordance with agency regulations and substantial evidence supports his conclusions, this assignment of error is overruled.

### 3. *Limitations for Vision Issues*

Next, Plaintiff relies on "evidence documenting [his] . . . lack of peripheral vision" to argue he cannot do medium work. (Doc. 8 at 3, citing R. at 52, 55, 450, 510, 581). More specifically, Plaintiff highlights a record from his primary care doctor, Dr. Kitchin, which states "[w]hile Plaintiff has no issues with ROM, he can't see so he can't perform work duties because he is a safety risk." (Doc. 8 at 3, citing R. at 581). Plaintiff also points to his two car accidents as evidence his vision precludes him from medium work. (Doc. 8 at 3).

But the ALJ considered all this evidence. To start, the ALJ found Dr. Kitchin's opinion unpersuasive because it was inconsistent with and unsupported by the record as a whole—a determination Plaintiff does not challenge. (*See* R. at 28; Doc. 8 (declining to raise an assignment of error based on the ALJ's evaluation of Dr. Kitchin's opinion)). In evaluating Dr. Kitchin's statement that Plaintiff could not work due to his vision, the ALJ pointed to records showing Plaintiff often walked two to five miles at a time and rode the bus without difficulty. (*Id.*, citing R. at 301, 303, 474, 507). Furthermore, the ALJ highlighted that Plaintiff did these tasks even after his car accidents. (*Id.*). The ALJ also discussed that Dr. Kitchin was "not treating [Plaintiff]"

13

for his vision issues, so his opinion was "outside [his] area of expertise, which renders the assessment less persuasive." (*Id.*).

Even so, the ALJ did not ignore his opinion, and he incorporated some of Dr. Kitchin's recommendations while including additional limitations. For example, Dr. Kitchin stated Plaintiff should not drive and was a "safety risk" due to his limited vision. (R. at 578–81). Similarly, the ALJ found Plaintiff should not drive. (R. at 28). The ALJ further said that Plaintiff should not climb ladders, ropes, or scaffolds or be exposed to "workplace hazards such as unprotected heights or dangers, unprotected moving mechanical parts[.]" (R. at 24). The ALJ also restricted Plaintiff to jobs that do not require "peripheral vision on the left" and do not have "low lighting" in the workplace. (*Id.*).

In making these determinations, the ALJ analyzed additional medical records about Plaintiff's vision issues besides those pointed out by Plaintiff. First, he noted that, in 2020, Plaintiff's visual acuity with correction was "20/40 and 20/25 in the right and left eyes respectively." (R. at 25, citing R. at 520–21). The ALJ highlighted that these records stated Plaintiff could not drive "due to visual field loss." (*Id.*). Although Plaintiff's vision did not improve, the ALJ found it remained "stable" through 2021. (*Id.*, citing R. at 479 (noting "no discernable change" in Plaintiff's vision), 488 (stating no change in Plaintiff's vision symptoms), 495 (same), 514 ("Subjectively the vision is stable[.]"), 517 (discussing no improvement in vision)). The ALJ then discussed Dr. Yoest's treatment notes from 2022, which showed Plaintiff's "[c]orrected vision at a distance was 20/20 and corrected vision for reading was 20/25." (R. at 26, citing R. at 425–30). Dr. Yoest also suggested Plaintiff struggled to detect hazards. (*Id.*, citing R. at 427). Based upon this evidence, the ALJ found that Plaintiff "is not statutorily blind but has abnormal visual fields" and "near and far acuity deficits." (*Id.*). The ALJ then concluded, with

14

the help of a vocational expert, that these impairments were not work preclusive, even with the additional limitations included in the RFC. (R. at 29–30; *see also* R. at 56–60 (vocational expert's testimony)). Therefore, considering the ALJ's analysis and the record as a whole, substantial evidence supports his determination that Plaintiff can do medium work, even with his vision issues.

### 4. Memory Limitations

Plaintiff further argues that records "documenting [his] confusion" and memory issues show he cannot do medium work. (Doc. 8 at 2–3). But Plaintiff cites only one mental health record in support of this argument. (*See id.*, citing R. at 394 (stating that post-stroke, Plaintiff had "[n]o change in memory loss/mental capacity" between medical appointments)).

Nonetheless, the ALJ accounted for potential cognition issues in his RFC. First, based on Plaintiff's subjective reports, he found Plaintiff had a "moderate restriction" in understanding, remembering, and applying information. (R. at 22–23). The ALJ also determined Plaintiff had a mild limitation in concentrating, persisting, or maintaining pace, mostly due to memory issues. (R. at 23). The ALJ based these conclusions on objective medical records showing Plaintiff had no cognitive deficits, received no treatment for memory issues, and appeared normal on mental status exams. (R. at 22–23, citing R. at 527–28, 530, 532, 537, 543, 547, 553, 558, 562–63, 568). The ALJ also pointed to Plaintiff's function report, in which he stated he had no concentration issues, could follow instructions very well, and only had some difficulty completing tasks. (R. at 22–23, citing R. at 298–305). But to account for any memory and concentration issues, the ALJ reasonably limited Plaintiff to "simple, routine tasks with no more than occasional changes in duties and the work setting." (R. at 24); *see Springer v. Comm'r of Soc. Sec.*, No. 5:19-cv-2562, 2020 WL 9259707, at \*10–11 (N.D. Ohio Oct. 8, 2020) (finding a limitation to "simple, routine tasks, with only occasional changes in the work setting" can account for memory limitations). This

analysis has substantial support in the record, and as a result, the Undersigned finds this assignment of error meritless.

### 5. Balance Issues

Finally, Plaintiff says his "residual issues with. . . balance" make him incapable of medium work. (Doc. 8 at 2–3). Plaintiff cites one relevant record in support. (*Id.* at 3, citing R. at 510). This record states that Plaintiff "struggle[ed] to bear weight" after one of his car accidents. (R. at 510). Yet the ALJ noted that less than two months after this accident, Plaintiff reported to a medical provider that he walked five miles a day. (R. at 26, citing R. at 507). More still, Plaintiff did not mention any balance issues at that appointment. (*See* R. at 507). Therefore, the single record Plaintiff cites does not overcome the substantial evidence supporting the ALJ's determination that Plaintiff can do medium work.

*** 

At base, these RFC arguments all ask the Undersigned to reweigh the evidence and determine which medical opinions in the record are more credible. But this Court may not do so. "[I]t is not this Court's job to reweigh the evidence, but only to determine if the ALJ has evaluated it in a reasonable fashion." *Whetsel v. Comm'r of Soc. Sec.*, No. 2:15-cv-3015, 2017 WL 443499, at *8 (S.D. Ohio Feb. 2, 2017). And "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Even though Plaintiff points to evidence that he believes requires a more limited RFC, the Court finds no error under this deferential standard.

**B.      ALJ's Analysis of Plaintiff's Symptom Severity**

Plaintiff also challenges the ALJ's analysis of his credibility and symptom severity under Social Security Ruling (SSR) 16-3p.  (Doc. 8 at 3–5).  Specifically, Plaintiff says the ALJ ignored his testimony and medical evidence of his "mental confusion and difficulty with" daily activities. (*Id.* at 5).

When a plaintiff alleges symptoms of disabling severity, the ALJ must follow a two-step process when evaluating those symptoms.  First, the ALJ must determine whether the individual has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged.  *See* 20 C.F.R. § 404.1529(c)(1).  Second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence according to seven factors.  20 C.F.R. § 404.1529(c)(2), (3). Relevant here, these factors include (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i)–(vii).  While the ALJ is not required to analyze all seven factors, he must show that he considered the relevant evidence.  *Kimberly C. v. Comm'r of Soc. Sec.*, No. 1:22-cv-637, 2023 WL 6807955, at *3 (S.D. Ohio Oct. 16, 2023) (citing *Roach v. Comm'r Soc. Sec.*, No. 1:20-cv-01853, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021)).

Although the ALJ's assessment of an individual's subjective complaints and limitations must be supported by substantial evidence and based on a consideration of the entire record, it

remains the province of the ALJ—not the reviewing court—to assess the consistency of Plaintiff's symptom reports against the record as a whole. *See Rogers*, 486 F.3d at 247; *Molly M. v. Comm'r of Soc. Sec.*, No. 3:20-cv-274, 2022 WL 336412, at *5 (S.D. Ohio Feb. 4, 2022) ("[I]t is not in this Court's province to reweigh the evidence or decide questions of credibility."). Furthermore, when an ALJ finds contradictions between medical evidence and a claimant's subjective reports, "discounting credibility to a certain degree is appropriate." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Therefore, "absent a compelling reason," an ALJ's credibility and consistency determination will not be disturbed. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

In challenging the ALJ's evaluation of his credibility, Plaintiff argues that the ALJ "cherry-pick[ed]" the record and ignored relevant evidence of his mental confusion and difficulties with daily activities. (Doc. 8 at 5). At the outset, the Court notes that a cherry-picking "allegation is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014). As previously discussed, this Court may not resolve conflicts in evidence and must affirm if the ALJ's decision is supported by substantial evidence. *Id.*

Here, the ALJ concluded Plaintiff's mental health symptoms did not limit his capacity to work as much as he alleged. In doing so, the ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. at 25).

The ALJ then determined Plaintiff should be "limited to perform simple, routine tasks with no more than occasional changes in duties and the work setting." (R. at 24). He further found that Plaintiff was capable of medium work with additional limitations. (*Id.*). Plaintiff argues that the ALJ ignored evidence of Plaintiff's difficulties with memory and daily living activities. (Doc. 8 at 5). Specifically, Plaintiff points to his reports that he has gotten lost and been hit by cars while walking. (Doc. 8 at 4, citing R. at 52, 55, 402, 450, 493, 510). Plaintiff also cites his testimony about his difficulties showering and recent homelessness. (*Id.*, citing R. at 50, 55).

But the ALJ acknowledged this evidence in his decision. For example, the ALJ noted that Plaintiff reported "becoming lost while walking or [forgetting] to take medications." (R. at 22; *see also* R. at 25 (discussing that Plaintiff could "walk to the pharmacy and bank, but alleged becoming lost on his way home")). In addition, he cited Plaintiff's testimony that he "used rails in the shower to prevent falls." (R. at 24; *see* R. at 50). He further discussed that Plaintiff lives in a homeless shelter, examined medical records about Plaintiff's car accidents, and questioned Plaintiff about these incidents during the hearing. (R. at 27, citing R. at 523 (stating Plaintiff lives in a homeless shelter), 565 (same); R. at 26 (discussing Plaintiff's two car accidents and his resulting injuries); R. at 52 (asking Plaintiff why he was hit by cars twice in a crosswalk)).

What's more, the ALJ cited evidence contrasting these reports. For example, the ALJ found that, despite his subjective reports, Plaintiff's "mental status exams were mostly normal with unimpaired memory and cognition." (R. at 22; *see, e.g.*, R. at 527 (noting no memory impairments), 528 (finding memory and orientation to be "normal") 530 (same), 532 (same), 537 (finding normal memory and orientation), 543 (same), 547 (same), 553 (same), 558 (same), 562–63 (same), 568 (same); *see also* R. at 27 (stating that Plaintiff's "neurological exams are consistently intact" and that even though he "reports some forgetfulness," he "does not exhibit

impaired memory or cognition on exam")).  The ALJ also noted that Plaintiff never received treatment for memory issues.  (R. at 22–23).  The ALJ further pointed to records stating Plaintiff does not struggle with concentration.  (R. at 23, citing R. at 492 (denying any trouble concentrating), 527 (noting that Plaintiff is "alert" and "fully oriented")).

Next, the ALJ examined Plaintiff's reports about his symptoms and daily activities.  First, although Plaintiff testified at his hearing about memory issues, the ALJ discussed that his function report showed "no difficulty with concentration" or memory.  (R. at 23, citing R. at 303 (reporting no issues with concentration or memory)).  Plaintiff's function report also denied any difficulties with completing personal care, using public transportation, cooking, walking, or handling stress or changes in routine.  (R. at 23, citing R. at 298–304).  These remarks are inconsistent with his testimony that he struggles to shower due to dizziness.  (*See* R. at 50).  Consequently, the ALJ found that "[t]he evidence does not support [Plaintiff's] testimony that he required assistance to perform basic tasks or use public transportation."  (R. at 27).

Put simply, the ALJ considered the records on which Plaintiff relies but found that other evidence contradicted Plaintiff's claims.  The ALJ supported his opinion with substantial evidence, including medical records, Plaintiff's ability to complete daily activities, the duration and intensity of Plaintiff's symptoms, and the lack of treatment Plaintiff received for his mental conditions.  Plaintiff has not identified a compelling reason why the ALJ's credibility determination should be disturbed, and this assignment of error is therefore **OVERRULED**.

### C.    Plaintiff's Alleged Need for a Walker

Plaintiff's next assignment of error centers on his alleged need for a walker.  (Doc. 8 at 5–6).  In his Statement of Errors, Plaintiff argues that the ALJ should have addressed his walker

20

usage more in his decision or asked the vocational expert questions about assistive devices during his hearing.  (Doc. 8 at 5).

But an "ALJ is not required to discuss every piece of evidence in the record or include every limitation."  *Carter v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 998, 1008 (S.D. Ohio 2015) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)).  Indeed, an ALJ "is only required to include in the [RFC] those limitations he finds credible and supported by the record."  *Lipanye*, 802 F. App'x at 170 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Here, limited evidence supports Plaintiff's assertion that he requires a walker.  For example, at the hearing, the ALJ asked Plaintiff if he used "a cane or some sort of assistive device." (R. at 51).  Plaintiff endorsed using a walker "once in a while" due to arthritis flare-ups.  (*Id.*).  Yet only one medical record mentions a walker.  (R. at 510).  In that record, Plaintiff reported using a walker after his second car accident.  (R. at 510).  And, as discussed by the ALJ, no medical provider ever prescribed a walker.  (R. at 27 (stating "[t]here is no documented medical need for any assistive device")).

The ALJ also noted that, less than two months after that car accident, Plaintiff reported walking "about 5 miles a day" with only "some hip pain."  (R. at 26, citing R. at 507 (not mentioning a need for a walker)).  The ALJ also explained that medical records showed Plaintiff consistently had normal gait, strength, and sensation with "no evidence of gait disturbance or falls that warrant the use of a walker or cane."  (R. at 27; *see, e.g.*, R. at 354 ("5/5 strength in all extremities"), 423 ("Good range of motion in all major joints"), 442 (stating Plaintiff had "5/5" strength in his extremities), 543 (noting no significant gait issues)).  Indeed, one medical record specifically found that Plaintiff used "no assistive device" after his 2022 car accident.  (*See* R. at

543). This evidence provides substantial support for the ALJ's statement that "[t]here is no evidence to support the use of a walker or other ambulatory device." (R. at 27).

While Plaintiff says that the ALJ should have questioned the vocational expert on his use of a walker, the Undersigned also finds no error in the ALJ's questions. "A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (citing *Varley v. Sec'y of HHS*, 820 F.2d 777, 779 (6th Cir. 1987)). Here, a hypothetical including a walker would not accurately describe Plaintiff's limitations, because scant evidence besides Plaintiff's testimony supports his need for an assistive device. *See id*. at 379 (affirming the ALJ's decision and noting that only one psychiatric assessment form supported the limitation the plaintiff sought). And while Plaintiff testified that he occasionally used a walker, the ALJ found his statements about his symptoms only partially credible. (R. at 25). As previously discussed, no compelling reason exists to disturb that credibility determination, and substantial evidence supports the RFC. This assignment of error is **OVERRULED**.

### D.    Alleged Contradictions Between Plaintiff's RFC and Job Requirements

Finally, Plaintiff raises a new assignment of error in his reply, arguing that his RFC is incompatible with the jobs the ALJ found him capable of doing. (Doc. 12 at 2). "[N]ew evidence and new arguments are not appropriate in a reply brief." *Jones v. City of Cleveland*, No. 1:19-cv-01275, 2020 WL 3270706, at *4 (N.D. Ohio June 17, 2020) (internal quotations omitted); *see* S.D. Ohio Civ. R. 7.2(d) ("Evidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition."). Therefore, Plaintiff has waived this

argument. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time. . . in replies to responses.").

Yet even if this issue was properly before the Court, it is without merit. At Plaintiff's administrative hearing, in response to hypothetical questions consistent with his RFC, the vocational expert testified that Plaintiff could perform jobs such as hand packager, laundry aide, and floor waxer. (R. at 58). Plaintiff argues he cannot do those jobs based on his comparisons of his RFC against the job descriptions from the Dictionary of Occupational Titles ("DOT"). (*Id.*).

Sixth Circuit precedent provides that an ALJ may rely on a vocational expert's testimony, even if there are conflicts between that testimony and the DOT. *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009). Under Social Security Ruling 00-4p, the ALJ must "inquire on the record, as to whether or not there is. . . inconsistency" between the vocational expert's testimony and the DOT. *Johnson v. Colvin*, No. 1:12-cv-507, 2013 WL 2456089, at *4 (S.D. Ohio June 6, 2013) (quoting S.S.R. 00-4p). But where the vocational expert testifies that there is no conflict with the DOT, the ALJ must develop the record further only if "apparent" conflicts exist. *Id.*

Here, the ALJ satisfied his obligation under the regulations when he asked the expert, "[H]as your testimony today been consistent with the Dictionary of Occupational Titles?" (R. at 59). The vocational expert said it was. (R. at 60 (clarifying that while the DOT does not address lighting in the workplace, her testimony on that matter was "based on ongoing training and experience [and] knowledge of jobs in the economy")). Then, Plaintiff's attorney had a full opportunity to cross-examine the vocational expert. (R. at 60). Yet on cross examination, counsel did not address any conflicts between the jobs chosen by the vocational expert and those jobs' descriptions in the DOT. (*See id.* (questioning the expert only on additional fingering and handling

limitations)).  Under these circumstances, "[t]he ALJ had no duty. . . to interrogate" the expert further.  *See Lindsley*, 560 F.3d at 606.

What's more, even if there was a conflict, "neither the DOT or the expert's testimony automatically trumps when there is a conflict."  *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (internal quotations omitted).  In those instances, the ALJ "must resolve the conflict by determining if the explanation given by the expert is reasonable and provides a basis for agreeing with the expert rather than the DOT information."  *Id.* (citing S.S.R. 00-4p).  But again, because Plaintiff did not raise any conflicts during his cross-examination or after the hearing, the ALJ was required to do no more.  Accordingly, the Undersigned finds no error.

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 8) is **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.


Date:   May 8, 2024                             /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE

24